(Decided December 3rd, 1896).

---

T. EDWARD HAMBLETON AND OTHERS *vs.* COLDEN RHIND.

*Rights and Liabilities of Members of Syndicates—Secret Benefit Obtained by Promoter of a Syndicate or Corporation—Duty of Principal to Make Full Disclosure—Liability of Principal for the Misrepresentation of His Agent to Form a Syndicate—Diversion of Partnership Property—Jurisdiction of Equity.*

A syndicate is an association of individuals formed for the purpose of carrying out some particular business transaction in which the parties are mutually interested, and the obligations of the members *inter sese* are substantially the same as those of the members of an ordinary partnership.

A secret arrangement by which one member of a syndicate obtains an advantage from the common property to the prejudice of his associates will be vacated in equity.

It is the duty of the promoters of a syndicate not only to abstain from making misrepresentations to their associates, but also to make a full disclosure of all the circumstances within their knowledge which may affect the extent of the advantages held out as inducements.

A secret contract made by the promoter of a syndicate for his own gain enures to the benefit of the concern which he organizes.

Any surreptitious dealing between one principal and the agent of the other principal is a fraud on the latter, and the defrauded principal is entitled to have the contract rescinded, or, if he elects not to have it rescinded, to have such other relief as a Court of Equity may think right to give him.

A person who employs an agent to form a syndicate for the purchase of property is responsible for the misrepresentations of that agent. And if the agent and promoter represents that he is not to receive any greater profits than the other members of the syndicate, then a secret agreement between the principal and such agent by which the agent does receive a greater profit is illegal, and the principal, chargeable with knowledge of the facts, is liable to make the same good to the other members of the syndicate, when he is claiming a fund payable to him under the agreement by which the syndicate was formed.

R. was authorized by the proper officers of the State of South Carolina to negotiate a sale of the bonds of that State to the amount of about five million dollars. R. employed L. as his agent and assistant. L. formed a syndicate of bankers and brokers in Baltimore to purchase the bonds, of which he was a member, and a Trust Company was selected as the agent of the syndicate to carry out the transaction. The members of the syndicate signed an agreement by which they contracted to purchase two millions of the bonds bearing 4½ per cent. interest, at par flat as of July 1, 1893, the bonds bearing interest from January 1, 1893, and an option was also given to the syndicate to take the balance of the issue on the same terms. It was agreed by the members that the Trust Company should pay to L. "for syndicate expenses" two-thirds of the interest on the bonds from January 1 to July 1, 1893, *i. e.*, a commission of one and one-half per cent. out of the interest. L. represented to the syndicate that he himself would not receive any part of this amount so payable to him for syndicate expenses, and urged the members not to inquire what disposition was to be made of this fund. There was, however, in fact a secret agreement between R. and L. that L. should receive one-third of the amount so payable "for syndicate expenses," and that R. should receive two-thirds of the same. On January 19, 1893, an agreement was made between the Trust Company as agent of the syndicate and the Governor and Treasurer of South Carolina, for the purchase of two millions 4½ per cent. bonds, bearing interest from January 1, at par flat, $100,000 being paid then and the balance to be paid on or before June 30. On March 7, 1893, a second contract was made between the same parties for the purchase of the remainder of the bonds, amounting to $3,250,000, on the same terms, under an option reserved in the first contract with the State. The syndicate contracted under the first subscription to $2,000,000 of bonds to get six months interest amounting to $45,000, and under the second subscription to $3,250,000 of bonds, also six months interest amounting

to $73,125, and the Trust Company was authorized to disburse " for syndicate expenses," two-thirds of this fund or $78,750. The bonds were purchased in pursuance of the contracts, and the proceeds of the July coupons came into the possession of the Trust Company. L. obtained $25,250, upon the authority of R., which was paid out of the fund set apart in the subscription agreement for syndicate expenses. When the members of the syndicate discovered that L. had received this advantage they claimed the same amount from the Trust Company, which still had possession of the remainder of the proceeds of the July coupons. The company filed a bill of interpleader against R. and L. and the members of the syndicate. L. disclaimed any interest in the controversy, and he was dismissed from the suit under an agreement that R. would not claim that L. was a necessary party. R. claimed two-thirds of the July coupons, less the amount paid to L. under drafts drawn by L. *Held*,

1st. That the reservation of two-thirds of the July interest for syndicate expenses included also the July interest under the second subscription to the bonds, and that the rights of the syndicate in both subscriptions were the same.

2nd. That under the contracts between the Trust Company and the State officials the syndicate agreed to purchase the bonds at par, *plus* the July interest coupons, and the proceeds of these coupons constituted a partnership fund belonging to the syndicate.

3rd. That since R. was chargeable with knowledge that L., as the promoter of the syndicate, could not obtain a part of this fund in excess of his share without the consent of the other members, the payment of the $25,250 by R. to L., under the secret agreement, was an illegal diversion of partnership funds.

4th. That since R. had thus given the partnership property to a person he knew not to be entitled to it, he was accountable in equity for the misapplication.

5th. That since R. was claiming the fund reserved for the syndicate expenses under drafts drawn by his agent L., he cannot receive any part of the same unless he restores the amount which he enabled L. thus illegally to receive, and that any equities which the members of the syndicate have against L. or the fund still attach to the fund when claimed by R.

6th. That R. is accountable to the syndicate for the $25,250 actually paid by him to L. and also for the sum of $1,000, being the remainder of the amount he agreed to pay to L., and that the residue of the sum reserved for the expenses is payable to R.

Appeal from an order of the Circuit Court of Baltimore City (Dennis, J.), passed in the case of the Baltimore Trust and Guarantee Company, agent of two syndicates, against

T. Edward Hambleton and others, by which it was held that the defendant, Colden Rhind, was absolutely entitled to the entire fund brought into Court by the complainant free from all claims of other parties.

The cause was argued before McSherry, C. J., Bryan, Fowler, Briscoe and Roberts, JJ.

*Charles Marshall, William A. Fisher* and *Archibald H. Taylor* (with whom were *Wm. L. Marbury, Henry J. Bowdoin, W. C. Bruce* and *D. K. E. Fisher* on the briefs), for the appellants.

The appellants will maintain : 1. That the commission, in any event, was payable only upon the first $2,000,000 of bonds. It was only these bonds which they contracted to purchase, and the commission for the expenses of the syndicate was understood to be for the services which were to be rendered in procuring the contract for these bonds. The right to take the other bonds, at the option of the purchasers, was one of the inducements to purchase and to pay the commission on the $2,000,000. The contract by which the appellants are bound is to be gathered from the two papers, introduced by the Trust Company to support the interpleader. The contract, Exhibit No. 1, offered in evidence, is that of E. H. Rollins & Sons, and is headed "Terms and conditions made this 30th day of December, 1892, by E. H. Rollins & Sons, for fifty thousand dollars of the new four and a-half per cent. bonds of the State of South Carolina." The commission, therefore, which was provided was on those $50,000 of the bonds. Like contracts were executed by the other members for the bonds which they took. The rights and privileges with reference to the taking of the bonds were provided in the first clause of the contract, that is to say, that they were to pay 5 per cent. in cash, and the balance on or before June 30, 1893, and that they should then be entitled to receive the interest on them, less the 1½ per cent. on the $50,000. No new services whatever could be rendered as to the bonds under

the option.   The labor would be over when the contract was made, and obviously it was made with reference to the $2,000,000 only, since it was entirely uncertain whether the parties would wish to avail themselves of an option.   It is quite certain, therefore, that Mr. Rhind regarded himself as compensated by the large commission of $30,000, since there was no certainty that there would be any other basis than the $2,000,000.   It is certainly remarkable that if $30,000 was deemed by him enough, the contract should admit of an interpretation that would give him $48,000 more.   The contract with the State contained no reference to the commission, but provided the option " in consideration of the purchase " of the $2,000,000 of bonds, and it was simply the option to buy the remaining bonds at par flat.   It was the right and privilege in the remaining bonds, that is, the right as respects the State, that was stipulated for in the fifth clause of Exhibit No. 1.   Clause No. 2 related to a different subject entirely—the commission payable for the services in procuring the contract for the $2,000,000, with the option.

2.  If the Court shall be of opinion that the contract was intended to stipulate for commissions on the entire amount under the second or option contract as well as under the contract for the purchase of the $2,000,000 of the bonds, then we submit that Mr. Rhind is entitled only to the amount less the sum received by Lancaster.   The payment which was made was certainly to Rhind.   The drafts were drawn by Lancaster to the order of Rhind, and the money could have been received by him alone if they had remained unchanged.   When he endorsed them and delivered them to Lancaster, and thus enabled Lancaster to obtain the money for them, he is to be regarded as the recipient of the payment as fully as if he had drawn the amount himself.   We maintain that the arrangement betweem Messrs. Lancaster and Rhind was a fraud upon the rights of the members of the syndicate; that Mr. Lancaster was a member of the syndicate, and had no right, therefore, to

procure any secret benefit for himself, and that, besides the inability which resulted from this relation, he procured the parties to enter into, and to complete their payments under, the syndicate, by deceptive statements as to his relations to the commissions ; that he was the agent of Rhind in procuring the subscriptions and his agent in receiving them ; that Rhind was, therefore, responsible as fully for all his acts and declarations as if he had acted in person.

No effort was made in the Court below, and probably none will be made in the Court of Appeals, to defend or to extenuate the conduct of Lancaster. It would be difficult, indeed, to present a case of more contemptible untruthfulness and evasion than his own statement of his conduct at the meetings of the syndicate. JUDGE DENNIS said that he would have had no difficulty in dealing with Lancaster, if he had the power to do so. It is sufficient that Mr. Lancaster was himself a member of the syndicate, especially to the knowledge of Mr. Rhind. When a syndicate is formed there is the implication that all its members shall stand upon an equal footing and that no one member shall take a secret benefit. This is a well understood matter among bankers entering into such relations. But the matter does not stand merely upon this footing. Mr. Williams, who was sent to Baltimore by Lancaster, and with the knowledge of Rhind, represented that all were to stand, in all respects, upon equality, and Lancaster, in Williams' presence, represented that he was not to receive any of the commission, except about $500 for his personal expenses.

Mr. Rhind now presents himself and invokes equitable principles, in order that the fund in Court shall be turned over to him, although it is payable to Lancaster. He claims that it is payable to him, and that this fact was known to all the members of the syndicate. The proof shows that it was known to some members of the syndicate, while it was not known to others. But the rights of the parties are the same in either case, since the acts of Lancaster affect Rhind equally under both circumstances. There is no apparent

privity on the face of the contracts.   Mr. Rhind cannot
obtain any part of the money without the assistance of a
Court of Equity, and he can obtain that only upon the con-
dition that he shall do what is equitable on his part, and the
very first condition must be that he shall not take over
again out of the fund what he has already procured, and
what he has, in disregard of the equities of the syndicate,
turned over to his agent and partner, Mr. Lancaster.   The
commission was, by the terms of the contract, payable "for
the expenses of the syndicate."   The theory of Mr. Rhind
is that it was for this purpose payable to Lancaster for him.
He knew that a commission to Lancaster without the
knowledge of his associates was no legitimate expense, and
hence neither he in person, nor Lancaster for him, had the
right to procure it.   *Emma Mine Co.* v. *Grant*, L. R. 11
Ch. Div. 933.   The attempt was made, in the argument, in
the Circuit Court, and may, perhaps, be repeated, to relieve
Mr. Rhind of the effect of the untruthful declarations of
Lancaster by the assertion that they were not made until
the parties had irrevocably committed themselves.   This
method of argument wholly ignores the declarations of
Williams that there was perfect equality, which were made
as soon as he came to Baltimore in order to bait the trap.

But the documentary evidence itself disposes of the
proposition also with respect to Lancaster.   The syndicate
arrangement was dependent on negotiations in Charleston
as to sale of bonds, not concluded until January 9, 1893.
The contract with the State was not made until January
19th, 1893, and the bulk of the money was not payable
and was not in fact paid until the latter part of June, 1893.
It is true that most of the contract papers were signed by
the members of the syndicate in the latter part of Decem-
ber, 1892, and the early part of January, 1893, but the
syndicate had not been completed in all its details by Janu-
ary 11th, 1893, when the parties were assembled for the
first time, and it was only the day after that meeting that
McKim & Co. signed their contract paper.   Mr. Williams

himself testified that the meeting of January 11th, 1893, was for the completion of the syndicate. And Mr. Lancaster testified that the syndicate was not even then completed because the Bank of Charleston declined to take $25,000 as expected, which it was necessary afterwards to provide for in Baltimore. The testimony shows that one of the declarations by Lancaster, that he had no part in the commission, was made by him at the first meeting, and that all, even by his own admission, were made prior to the time when the parties to the syndicate made their payments, except the first 5 per cent.

Mr. Rhind, in his answer, undertook to disavow the authority of Williams to make representations, though, with an absence of consistency, he fails to deny the authority of Lancaster to deputize him. But the facts in the case establish that he was fully cognizant of Mr. Williams' agency in the matter, and he is affected by his declarations and conduct, as well as by those of Lancaster.

The syndicate contract was between its members in order to define their rights *inter sese*, and also the limits of the authority of the Trust Company as their disbursing agent. In fact Rhind cannot claim even under that contract. That contract did not operate beyond the syndicate members and the Trust Company as their agent. The claim must be that, outside of it, there was a promise to Lancaster for Rhind's benefit. But whether the right be founded on the one or other contract, when Mr. Rhind comes into Court he does so upon the claim that it is the duty of the Trust Company to pay the fund over to him because there was a contract with his agent, Lancaster, for his benefit. Doing so, can he avoid the application of the equitable principle that he himself must comply with the rules of equity? If the title to the fund, derived as it is from the July coupons purchased and paid for by the appellants, is in them, and Mr. Rhind, seeking to obtain the money by reliance upon this contract, made, as he claimed, on his behalf by Lancaster, is he not bound by the effect of the concealments

and misrepresentations by which the contract was obtained, and can he procure it all by the decree of a Court of Equity when to the extent of one-third the syndicate were cheated by Lancaster into providing it, whether with or without the connivance of Rhind?

Suppose that the discovery had been made before Mr. Rhind had passed over to Lancaster any part of the commission, and before an interpleader, could there be any doubt under these circumstances that the Court would have restrained the Trust Company from paying over the amount, one-third, which Lancaster was to receive? If the discovery had been made after the interpleading, is there any more doubt that the Court would have ordered the one-third to be retained, and distributed among the defrauded members of the syndicate? Can the fact that Mr. Rhind and Mr. Lancaster arranged between them so that Lancaster was enabled to withdraw $25,000 or $30,000 before it could be stopped, make any difference? We submit that it cannot—first, because Rhind is chargeable for Lancaster's and Williams' conduct as his agents, on account merely of the existence of such relation; and secondly, because Rhind had full knowledge of the fact that Mr. Lancaster had induced others to enter the syndicate and had become a member with them, and that he could not lawfully make an arrangement such as he did with Lancaster.

He had been under engagements with him to divide commissions before the first step was taken to induce the appellants to enter into the contract, and he had executed a formal contract on the second of January. Before the syndicate contract was effective by the execution of the contract with the State, he had seen that of the syndicate which apprized him of the fact that the syndicate had agreed to pay over to Lancaster 1½ per cent. to be appropriated to the expenses of the syndicate, and he knew that a secret reservation of one-third of the amount to Lancaster, in every just and honest sense, excluded this sum from being part of the expenses. Evidence of knowledge upon the part of

Rhind is really unnecessary, however. *W. Md. R. R. Co.* v. *Franklin Bank*, 60 Md. 44.

Messrs. Rhind and Lancaster and their agent, Mr. Williams, were *promoters* of the syndicate, charged with all the duties and responsibilities of that relation to the members of the syndicate, and Lancaster, in order to aid the scheme, became a member of it. *L. R. 6 Ch. Div.* 382, 383, 385 ; *Phosphate Co.* v. *Hartmont*, L. R. 5 Ch. Div. 455, &c. ; *New Sombrero Co.* v. *Erlanger*, Law Rep., 5 Ch. Div. 118, bottom of page.

There is no difficulty about the remedy, if we have made out our right ; the arm of the Court is not so short as the argument would suggest. We understand the rule of equity in any case involving surreptitious dealings to be accurately expressed by LORD JUSTICE JAMES in the case of *The Panama and South Pacific Tel. Co.* v. *India Rubber Gutta Percha Tel. Co.*, L. R. 10 Ch. App. 526. No one disputes that the jurisdiction in equity had properly attached over the fund. In fact a decree to that effect has been passed from which Mr. Rhind has not appealed. When, therefore, the jurisdiction had once been obtained, it will be retained for the complete adjudication of the rights of all. *Phelps' Juridical Eq.*, 260, 261 ; *Bispham's Principles of Eq.*, 53. And the Court will mould the relief to the circumstances, such being the unique power of a Court of Equity, upon which it has been builded up, and the sole motive for its separate existence. *Crain* v. *Barnes*, 1 Md. Ch. 155 ; *Eastman* v. *Bank*, 58 N. H., 422 ; *Poland* v. *R. R. Co.*, 52 Verm. 175-6 ; *McGraw* v. *Metropolitan E. R. Co.*, 133 N. Y. 16-17 ; *Walters* v. *Farmers' Bank of Va.*, 76 Va. 12 ; *Rust* v. *Ware*, 6 Grattan, 50.

We claim that Mr. Rhind is responsible for "the frauds, deceits, concealments and misrepresentations" of his partner and associate, Mr. Lancaster, and of the agent of the associates, Mr. Williams (60 *Md.* 441) ; that as Lancaster and Rhind were associates, even if Rhind is innocent *they are jointly and severally bound to make good* the whole amount

which was unlawfully exacted and procured from the syndicate (*L. R.* 6 *Ch. Div.* 385, and *L. R.* 10 *Ch. App.* 526), and that in no respect can their rights be abridged, because they did not discover the deceit until Lancaster had obtained part of the commission. *L. R.* 5 *Q. B. Div.*, page 112 and 113.

The argument that the syndicate is without remedy because there had been a partnership settlement between Rhind and Lancaster, under which Lancaster has obtained part of the commission, is a startling one. Both of these parties are liable to the syndicate for the money, and both could be sued for it. Upon what principle is it, therefore, that because the custody of part of it has been changed by its passing through Rhind's hands into those of Lancaster, the rights of the defrauded owners of the money are affected? In truth, it would be peculiarly unjust and inequitable to allow such a defence under the circumstanses of this case. Both Rhind and Lancaster are non-residents of Maryland, and the only protection which the appellants can obtain is from their hold upon the fund in Court. Is it possible that this remedy should be refused them on the theory that they might have some other remedy against Lancaster and Rhind, or either of them, in some other proceeding?

The Court decreed an interpleader among certain of the parties, about questions in which the rights of Lancaster might be involved, and which the Court must decide, in order to dispose of the fund in Court, but decreed that those other parties should interplead, notwithstanding the dismissal of Lancaster from the proceedings. The Judge who passed the final decree in the case considered that the claim against Lancaster was clearly made out, but by reason of the dismissal of the bill as to him above referred to, the Court could not give the relief to which the parties to the interpleader had shown themselves to be entitled. It was as though the Judge who passed the first decree had said: We will have the play of Hamlet, and then had told Hamlet to go, and ordered the play to go on without him, and the

second Judge had said : The play can't go on because Hamlet has been sent away, and it can't be performed without him.

The decree of JUDGE WICKES, dismissing the bill as to Lancaster and ordering an interpleader, was, therefore, *felo de se, if Lancaster is a necessary party to the interpleader,* as JUDGE DENNIS held him to be. No appeal, however, was taken from JUDGE WICKES' decree, because of the agreement on the part of Colden Rhind. This agreement did not deter the Judge of the Circuit Court from allowing Colden Rhind to take advantage, as his only defence, of the fact that the bill had been dismissed as to Lancaster. But we do not believe that the right of the parties to the interpleader suit, to have their respective rights to the fund in controversy decided in this case, was affected by the dismissal of the bill as to Lancaster. It is submitted that the object of the suit was to dispose of the fund that was brought into Court by the plaintiff in the interpleader, and that that fund is before Court awaiting its distribution to the proper parties, and that all those who claim an interest in it had a right to have the question decided, so that the Court may pass a final decree in the matter. The fund in Court was originally a partnership fund. It was earned by the syndicate, and was to be divided among its members, and such other persons as they had given an interest in it according to their respective rights *inter sese.*

*Richard M. Venable* and *Edwin G. Baetjer,* for the appellee.

I. The principal ground on which the answers of the appellants based a claim to the fund was that the members of the syndicate had been induced to join it by false representations made by Lancaster. Thus the sworn answer of Hambleton & Co. states that *before Plaintiff's Exhibit No. 1 was signed by them,* a meeting was held in Baltimore, at which Lancaster was present, and made certain statements as to the persons to whom the commission was to go, and

that if it had been known to them that the statements made by Lancaster, " that he had no interest in said commissions, and that all the members of the syndicate stood upon the same footing, were untrue, they would not have entered into either of said contracts."　Similar allegations are made in the answers of other parties.　Yet the proof shows that all of these defendants, with the possible exception of Mc-Kim & Co., signed the agreement, Plaintiff's Exhibit No. 1, before they saw Lancaster or had any conversation with him on the subject.

II. The next ground for the claim of the appellants was that, by the true construction of the contract, the commis-·sion was to be paid only on the original $2,000,000 of bonds, and not on the $3,250,000.　Looking merely to the papers themselves this contention cannot be maintained. By the terms of the original subscription papers each subscriber took a specified amount of the $2,000,000, and the interest from January to July, 1893, less the amount of the commission (1½ per cent.) and syndicate expenses, and the bonds were to be pooled and sold by the trustee.　Then the agreement proceeds: " 5. It is understood that the syndicate shall have the same rights and privileges in the balance of about $3,800,000—of bonds as hereinbefore provided with reference to the $2,000,000—of said bonds."

These subscription papers thus worded were sent to South Carolina with the contract between the State and the Trust Company, as agent of the syndicate, for the purchase of the $2,000,000.　This contract provides: " And in consideration of the purchase aforesaid by the party of the second part, the parties of the first part hereby further covenant and agree to sell and deliver to the party of the second part, its successors or assigns, so much of the remainder of the bonds and stock issued, or to be issued, by virtue of the said Act, as is saleable by the Governor and Treasurer under the said Act, or any part thereof; said bonds and stock to bear date January 1, 1893, to carry interest from January 1, 1893, and to be paid for at par flat, said remainder of such bonds and stock being understood to be $3,800,000.

"Provided, however, that the offer of sale hereby made shall be accepted in due form on or before the first day of April, 1893 ; and it is agreed that five per cent. upon all purchases made under this option shall be paid on account thereof at the time such purchases are made, and that the remainder due upon the bonds and stocks so purchased may be paid for at any time and in any amounts, at the pleasure of the party of the second part, on or before the 30th day of June, 1893 ; and said bonds and stocks shall be delivered by the parties of the first part to the party of the second part, its successors or assigns, in such sums and at such times as they may be called for by the party of the second part upon the payment of the ninety-five per cent. remainder due thereon."

The contract between the State and the syndicate for taking the $3,250,000 of bonds, is dated March 7th, 1893. It recites the agreement, and specifically the clauses relating to the option.

III. The next ground on which the appellants claim an interest in the fund is that Lancaster, being a member of the syndicate, could not, by getting a part of the commission without disclosing the fact to the syndicate, secure an advantage over them ; and that Rhind having paid this commission, the syndicate, in some way, had a claim against the money in the hands of the Trust Company belonging to him.

1. The first reply to this is, that at the time the appellants signed the subscription paper the only information they had as to who was to get the commission was from the paper itself, and that showed that Lancaster was to get the entire commission. The paper disclosed to them that Lancaster was to get a commission and what that commission was.

By the true interpretation of the agreement, the subscribers to the bonds took no interest in the two-thirds (1 ½ per cent.) of the interest (2 ¼ per cent.) on the said bonds from January to July, 1893 ; and by said agreement, they

agreed that the 1½ per cent., should it come into the hands of the Baltimore Trust and Guarantee Company, should be paid to R. A. Lancaster & Company as a commission. In other words, when they signed that paper before having seen Lancaster, or before any representations were made to them by him, they, by signing it, agreed to take no interest in the 1½ per cent., and that it should be paid to Lancaster & Company as a commission, without any reference whatever to whether Lancaster & Company did, or did not, get it all, or any part of it, and knowing, so far as their information went and from the paper, that Lancaster & Company were to get it all.

Thus the subscribers were to receive not the bonds and interest from January to July, 1893, but these, less the expenses in case the Trust Company received the interest. What were the expenses to be paid, and to whom, before the subscribers got any of the interest? These were, first, a commission of 1½ per cent. to R. A. Lancaster and the other expenses mentioned in clause 4. Placing ourselves in the position the subscribers were in when they signed that paper, they knowingly agreed that R. A. Lancaster & Company, a member of the syndicate, should be paid a commission of 1½ per cent. from moneys, to which they had no claim under the subscription. But it is claimed that Lancaster was to take this as a trustee or agent for the syndicate, and was to spend it for syndicate expenses, to-wit, to pay a commission of 1½ per cent. to a person or persons undesignated. The paper does not bear this interpretation. In the first place the agreement by its terms did not give the members of the syndicate any interest in the commission. It merely provided as to the commission that, if it came into the hands of the Trust Company, it was to pay it to Lancaster. The subscribers, therefore, had no power to impose a trust on this commission or to designate a person to disburse it. Even if they had such power, the agreement does not by its terms create a trust or agency.

The phrase on which it is claimed that such trust or

agency is created is "for syndicate expenses," clause 2. The reason for using this phrase is to be found in clause 1. By that the interest on the bonds from January to July, 1893, was to go to the subscribers, "less the amount hereinafter mentioned for syndicate expenses." The phrase " for syndicate expenses," in clause 2, is intended to refer to this, and show that the commission was one of the excepted syndicate expenses. But clause 2 does not leave the matter here; it goes on to designate specifically the purpose for which this 1½ per cent. is to be paid to Lancaster ; " that is to say, a commission of 1½ per cent. out of the interest or profits received on the bonds." The clause designates the syndicate expense of 1½ per cent. ; the purpose for which it is to be paid—a commission, and the person, Lancaster, to whom it is to be made. The case, as it stood when the parties signed this agreement, resolved itself then into a case where a syndicate agrees to pay one of its members a commission for special labor in getting up the syndicate.

The matter may be put in another light : Assuming that Lancaster had received the whole commission, could he be called on by the syndicate to account for it under Plaintiff's Exhibit No. 1, in the absence of proof that the subscribers had been induced to sign by fraudulent representation ? What Lancaster may have afterwards said had nothing to do with the case. That must be determined by the paper. This view is strengthened by another consideration. The appellants aver in their answer and testify that if they had known that Lancaster got a portion of the commission they would not have subscribed, because this profit to Lancaster would enabled him to undersell in reselling the bonds. This contention is completely repelled by the agreement itself. " 3. The said E. H. Rollins & Sons shall have no right by virtue of his said subscription to actual delivery of said bonds from said Trust Company, but shall, in addition to the interest provided for in section 1 hereof, be entitled to receive from said Trust Company a share of the whole profits, if any, that may be realized by the sale of the bonds

by syndicate·at a greater price than that paid for them, the
share of said E. H. Rollins & Sons in said profits to be in
the proportion that the number of the said bonds subscribed
for by him may bear to the whole number of bonds sub-
scribed for by the syndicate."

The fact that the agreement protects the subscribers from
such undersale tends to show that the signers felt that they
were protected in giving a commission to Lancaster, and
under this protection knowingly did it.  This view is further
strengthened by the fact that a number of subscribers never
made any claim to any portion of the commission.  The
interpretation placed on a paper by parties to it has weight
in case of doubt as to the interpretation.

The views presented above make it unnecessary to dwell
on the representations made by Lancaster.  If these repre-
sentations had been made before the syndicate was formed,
and the proceeding was intended to annul or modify Plain-
tiff's Exhibit No. 1, these representations might be reviewed
to show that they did not come up to the standard of defin-
iteness, in proof or substance, required by law.  Nor would
there be any sufficient proof that these representations con-
stituted the inducement to signing the agreement.  The
reason the appellants give for the statement that they would
not have signed the paper if they knew Lancaster had an
interest, is that it would enable him to undersell them.  ·This
is absolutely repelled by the fact that without any represen-
tations from him, they signed the paper giving him the com-
mission, and it specifically guarded them against the under-
selling.  But these representations are relied on for another
purpose.  They are claimed to be a breach by Lancaster of
his duty as a ·member of the syndicate to make  a candid
disclosure of his interest.  But when does this duty begin
and end ?  The syndicate had been formed ; the members
had all signed a paper, by which the commission was to be
paid to Lancaster ; and the inquiries addressed to Lancaster
related to what he was going to with it or what portion of
it he took.  As Lancaster says in his testimony as the
matter then stood, this was none of their business.

(2). But assuming that Lancaster violated his duty to the syndicate, in what way can a fund belonging to Rhind be used to make good to the appellants a sum of money due from Lancaster? To cover this point the answer of the appellants charge that Rhind was a party with Lancaster to a fraud on them. On no other theory do they set up any claim against Rhind. There is no proof whatever of any fraud or deception on the part of Rhind. Lancaster made a proposition to him, and he accepted it to get up a syndicate to take the $2,000,000 of bonds and an option on the residue for $30,000. This was a perfectly legitimate arrangement. Lancaster was prepared on December 10, 1893, to make a definite offer to take the bonds. He wrote to that effect on that day to Rhind. Rhind carried this letter to Governor Tillman with the names of the subscribers. When it was accepted he went home to Augusta. The work Lancaster had agreed to do was done.

As the learned Judge below says, the contract between Rhind and Lancaster was a perfectly legitimate contract when originally made. Nothing that Lancaster could subsequently do without the knowledge and connivance of Rhind, could vitiate that contract. When Lancaster, on June 6, 1893, demanded of Rhind a compliance with that contract, Rhind did not know of anything done by Lancaster to affect it; he had himself done nothing and he paid Lancaster the amount due him under the contract. Rhind occupied no fiduciary relation to the syndicate. He was not its agent; he was not a member of it; he did nothing to get it up. Even if he had known that they were deceived as to Lancaster getting an interest in it, or that it was concealed, which he did not know, he was under no obligation to enlighten them or to pay over Lancaster's interest to them. So far as he was concerned they were bound to look to Lancaster. The contention of the appellee is that, even if Rhind knew that Lancaster's profit was concealed from the syndicate, and with this knowledge, paid over the money to Lancaster, the syndicate must recover it from Lancaster

and cannot recover it from Rhind, or, which is the same thing, out of a fund to which he is entitled. This is the case of *Whaley Bridge Works* v. *Green*, 5 Q. B. Div. 109.

But in the present case Rhind had no knowledge whatsoever that the syndicate did not know of Lancaster's interest in the commission. It is not claimed that he ever heard of any representations made by Lancaster until after the appellants had warned the Trust Company not to pay him the commissions. He had on January 19, 1893, been shown Plaintiff's Exhibit No. 1. The information conveyed to him by that was that the commission was to be paid to Lancaster and that the subscribers knew it.

We have seen that the 1½ per cent. was the property of Colden Rhind before any members of the syndicate were approached. To obtain title at all they must have obtained it from Rhind.

The only possible pretension of the claimants to title are: *First*.—That Rhind, as Lancaster's principal, is responsible in damages for his misstatements.

Even if this were true, it might give them a claim against Rhind, but until reduced to judgment and an attachment issued it would give them no claim against the fund any more than against his bank account in Augusta.

*Second*.—That Rhind did transfer one-third to Lancaster; that Lancaster, being the syndicate's agent, this one-third became vested in the syndicate. The question to be determined in every interpleader suit is the right of the claimants against the stakeholder, not the right of the claimants against each other.

Illustration : To ascertain to whom he is indebted for $500, a bill of interpleader is filed by A against B, A against C. The question to be determined is whether A is liable to B or C, not the rights of B and C against each other, and this whether the indebtedness between B and C arose out of the same transaction as the debt due by A. *Zihlman* v. *Zihlman*, 75 Md. 372.

Applying these rules to the case at bar. Where did the

syndicate get its *title?* (not claim against Rhind or Lan-
caster for damages). This would, however, only give to
each member of the syndicate his proportionate amount of
the amount paid Lancaster, while, in fact, they claim their
respective proportions of the whole $78,500.

McSherry, C. J., delivered the opinion of the Court.

There are ten appeals now before us in a single record,
but only one opinion will be required to cover them all;
because, whilst there are some slight variations in minor
details, the material facts in all the cases are identical and
precisely the same legal principles are applicable to them.

Sometime in the early fall of eighteen hundred and
ninety-two the appellee, Colden Rhind, a resident of the
State of Georgia, obtained authority from the Governor
and Treasurer of South Carolina to float for that State,
upon certain stipulated terms, an issue of about six millions
of her four per cent bonds, the proceeds of which were to
be used in retiring an outstanding and shortly maturing
prior series known as " Brown Consols." He proceeded
to New York, and after endeavoring, without success, to
organize a syndicate to purchase the bonds, suggested a
change in the character of the securities and then resumed
his efforts. By the new scheme the bonds instead of being
four per cent. forty-year bonds were, subject to the ap-
proval of the Legislature, to be four and a-half per cent.
twenty-forty-year bonds, and were, when negotiated, to net
the State par. Rhind approached a banker by the name
of Lancaster, who carried on business in both New York
and Richmond, and agreed to give him, as compensation
for his aid in forming a syndicate, one-third of the commis-
sion which Rhind himself might realize out of the transac-
tion. Failing to secure a sufficient number of subscribers
in New York, Lancaster, acting for and as the agent of
Rhind, proceeded to Richmond in the month of December,
and there enlisted the co-operation of the banking firm of
Williams & Son, one of whose members suggested that he

could probably fill up the syndicate from amongst his acquaintances in Baltimore. Accordingly, with the sanction and approval of Lancaster, I. Skelton Williams went to Baltimore in the latter part of December, approached and interviewed the appellants and others, and solicited them to join the syndicate ; and if this was not done with the knowledge of Rhind, certainly it was subsequently ratified by him. Williams represented to the appellants that all the subscribers to the bond purchase were to be placed on the same footing of perfect equality, and that each was to share alike in the profits of the venture. He further represented that there were expenses connected with the syndicate that would have to be provided for out of the profits. After considerable negotiation a sufficient amount was conditionally subscribed in Baltimore to make up with what had been taken elsewhere, the sum of two millions of dollars ; and the Baltimore Trust and Guarantee Company was selected as the agent of the syndicate to carry out and consummate the transaction. Each of the appellants became a subscriber and each signed a memorandum setting forth the terms and specifying the amount of his subscription; and whilst these papers were executed at different times they all bear date on the thirtieth of December, eighteen hundred and ninety-two, and they were all executed in anticipation of the purchase of the bonds from the State. The material parts of these subscription contracts are in these words : "2. The said Trust Company shall pay to R. A. Lancaster & Co. of New York City, for syndicate expenses, two-thirds of the interest on said bonds from January 1st, 1893, to July 1st, 1893, that may be received by it, that is to say, a commission of 1½ per cent. out of the interest or profit received on said bonds. 3. The said * * * shall have no right by virtue of his said subscription to actual delivery of said bonds from said Trust Company, but shall, in addition to the interest provided for by section 2 hereof, be entitled to receive from said Trust Company a share of the whole profits, if any,

that may be realized by the sale of said bonds by syndicate, at a greater price than that paid for the same, the share of the said  *  *  *  in the said profits to be in the proportion that the number of the said bonds subscribed for by him may bear to the whole number of bonds subscribed for by the syndicate. 4. The said Baltimore Trust and Guarantee Company is also authorized to pay R. M. Marshall & Bro. $2,500; the Bank of Charleston, N. B. A., $1,000; the Baltimore Trust and Guarantee Company $500, and such other expenses as may be authorized by the syndicate. 5. It is understood that the syndicate shall have the same rights and privileges in the balance of about $3,800,000 of bonds as hereinbefore provided with reference to the said $2,000,000 of said bonds." The subscriptions first made related only to the sum of two millions of the issue, but under the fifth clause an option was given to the subscribers to take the residue of the bonds, amounting to three millions two hundred and fifty thousand dollars, on precisely the same terms. This option was availed of on March the seventh, eighteen hundred and ninety-three. It was understood that the subscriptions for the first two millions were only to be binding in the event that the syndicate should succeed in disposing of that amount of the bonds to parties in South Carolina or elsewhere outside of the syndicate. This condition having been ultimately complied with, a meeting of the members of the syndicate was held in Baltimore, on January the eleventh or twelfth, eighteen hundred and ninety-three, and this meeting was attended by Lancaster. It is proved beyond the possibility of doubt that Lancaster then and there and repeatedly afterwards unequivocally declared that he had no interest beyond about five hundred dollars for travelling expenses, in the fund payable under the second clause of the subscription agreements to R. A. Lancaster and Company "for syndicate expenses." He urged the members of the syndicate not to press him with inquiries as to what disposition was to be made of this fund for "syndicate expenses," and strongly intimated that

it was to be used in some way among parties who exercised political influence in South Carolina; though he declared emphatically that he knew not to whom the money was to go and persistently protested that he did not wish to know. This fund, as the clause already quoted from the subscription agreement shows, was to be raised by deducting two-thirds from the amount of the interest due July the first, eighteen hundred and ninety-three on the new four and a-half bonds. The syndicate agreeing to take the two millions of bonds at par flat as of July the first, and also agreeing under the option to take the remaining three millions two hundred and fifty thousand, the interest coupons to mature that day for the preceding six months and amounting to two and a-quarter per cent., were to be the property of the syndicate, and out of their proceeds, when paid by the State Treasurer, a portion of the profits of the members was to be derived after the syndicate expenses and the other items named in the fourth paragraph of the subscription papers were first subtracted. It is obvious, therefore, that one of the things which the members of the syndicate contracted to get and one of the things that was to be their common property, under both the original subscription and the option, was this six months' interest amounting at two and a-quarter per cent. on the two millions of dollars to the sum of forty-five thousand dollars, and on the remaining three millions two hundred and fifty thousand dollars to the further sum of seventy-three thousand one hundred and twenty-five dollars, and aggregating the gross sum of one hundred and eighteen thousand one hundred and twenty-five dollars. The Trust Company was authorized to disburse in discharge of "syndicate expenses" from this common or partnership fund for the benefit of the whole syndicate two-thirds, or seventy-eight thousand seven hundred and fifty dollars, if the entire 5,250,000 of bonds were included under the second clause of the subscription agreements, or thirty-thousand dollars if only the 2,000,000 purchase was embraced and covered by that clause.

It was perfectly natural that the members of the syndicate should inquire of Lancaster, himself also a member, as to what these expenses were for ; and both as a promoter of and a participant in the enterprise he was bound to disclose the literal truth on this subject to his associates ; but as already stated and as the sequel will further show, he not only did not content himself with a mere concealment and a suppression of the truth, but he deliberately uttered the most unblushing falsehoods, strictly in keeping with his subsequent reprehensible efforts, during his examination as a witness, to deny, avoid and explain away his glaring duplicity. After the most unqualified declarations on the part of Lancaster, who, it must be borne in mind, was acting throughout this whole transaction as the agent and partner of Rhind, to the effect that he had no interest in these expenses and was to get no part of the proceeds of these coupons beyond the five hundred dollars already named, the arrangement to take the two millions of bonds was concluded, and on January the nineteenth, eighteen hundred and ninety-three, a contract for the purchase of the bonds with the interest coupons attached was entered into between the Baltimore Trust and Guarantee Company, as agent for the syndicate, and the Governor and the Treasurer of South Carolina in behalf of the State. By that agreement it was provided :

" That under and by virtue of the Act of the General Assembly of the State of South Carolina, hereinafter mentioned, the parties of the first part hereby covenant and agree to sell and deliver to the party of the second part, its successors or assigns, and the party of the second part, in its own behalf, to the extent of its subscription and as agent as hereinbefore set forth, hereby covenants and agrees to purchase from the parties of the first part, for itself and its associates, two million ($2,000,000) dollars of the bonds and stock bearing four and a-half (4½) per cent. interest, payable semi-annually, and issued pursuant to the terms of ' An Act of the General Assembly of the said State of

South Carolina, entitled an Act to provide for the redemption of that part of the State debt known as the Brown consol bonds and stock, by an issue of other bonds and stock,' approved the 22nd day of December, 1892, upon the following terms and conditions, that is to say: The bonds and stock so purchased shall bear date January 1st, 1893, and shall carry interest from January 1st, 1893, payable semi-annually; they shall be sold by the parties of the first part and purchased by the party of the second part at par flat; that is to say, nothing additional shall be paid for any interest which may have accrued at the time of delivery; the purchase money of said bonds and stock shall be due and payable one hundred thousand ($100,000) dollars thereof upon the execution of this contract and the remainder thereof on or before the 30th day of June, 1893, in such sums and at such times. as to the party of the second part may be most convenient, and the said bonds and stock shall be delivered by the parties of the first part to the parties of the second part in such amounts and at such times as they may be called for by the party of the second part upon payment of the balance of ninety-five (95) per cent. due thereon; the said sum of $100,000, being held and taken to be 5 per cent. upon the whole purchase of $2,000,000, and that payments of said balance of ninety-five (95) per cent. may be made by said party of the second part, either in cash or in Brown consols, due July 1st, 1893, the July coupons thereon being retained by the party of the second part."

A subsequent clause of the same agreement reads as follows:

"And in consideration of the purchase aforesaid by the party of the second part, the parties of the first part hereby further covenant and agree to sell and deliver to the party of the second part, its successors or assigns, so much of the remainder of the bonds and stock issued, or to be issued, by virtue of the said Act, as is saleable by the Governor and Treasurer under the said Act, or any part thereof, said bonds

and stock to bear date January 1st, 1893, to carry interest from January 1st, 1893, and to be paid for at par flat, said remainder of such bonds and stock being understood to be $3,800,000."

On the second of January, eighteen hundred and ninety-three, and consequently before the syndicate was fully formed and before its obligation to take the bonds was complete, and before Lancaster made his false representations, Rhind and Lancaster entered into a secret agreement by which it was stipulated that in the matter of the refunding of the South Carolina State debt "the commissions *we* expect to earn thereon of one and one-half per cent., is to be divided between *us* in the proportion of two-thirds to Colden Rhind and one-third to R. A. Lancaster & Co."

When it was concluded to avail of the option provided for in the clause quoted above, as to the residue of the bonds over and beyond the first two millions, a second contract, bearing date March the seventh, was made between the Trust Company and the State officials of South Carolina. Some of the members of the first syndicate declined or failed to unite in the second purchase and other parties took their places; and this is what is called in the record, the second syndicate. One of the questions to be disposed of is, whether two-thirds of the July, 1893, interest on these three millions two hundred and fifty thousand dollars of bonds covered by the second purchase in execution of the option, is payable to Lancaster and Company under clause two of the original subscription agreements for "Syndicate Expenses."

The Trust Company conducted the business for the syndicate with the State's officers, and the proceeds of the July coupons were remitted to it or treated as if in its actual possession. On the sixth of June, 1893, Lancaster and Company drew five drafts, aggregating twenty-five thousand two hundred and fifty dollars on the Trust Company, payable to the order of Colden Rhind, which Rhind at once indorsed in blank without recourse and delivered

to Lancaster, who procured them to be accepted by the
Treasurer of South Carolina with the consent of the Trust
Company in part payment of the bonds bought by Lancaster.
The drafts for this sum of twenty-five thousand two hundred
and fifty dollars were drawn upon and were ultimately paid out
of the fund set apart in the subscription agreement for " syn-
dicate expenses."   When it was discovered by other mem-
bers of the syndicate that Lancaster, one of their number
and a copartner with them in the transaction, had received
a large sum in excess of his legitimate share of profits,
they promptly notified the Trust Company not to pay out
any further portions of this fund and asserted a claim to
the residue.   The Trust Company was thus confronted with
conflicting claims to the fund—on the one hand, Rhind as-
serted that he was entitled to it for two reasons ; first, under
three drafts drawn in his favor by Lancaster and Company on
the Baltimore Trust and Guarantee Company, for sums ag-
gregating forty eight thousand five hundred dollars ; and
secondly, because, though the fund was made payable to
Lancaster and Company, it was known and understood by
the members of the syndicate that the money was really
payable and belonged to Rhind.   On the other hand the
appellants insisted that the fund belonged to them to the
extent that was necessary to equalize them with Lancaster;
and they further contended that only two-thirds of the in-
terest due on the first two millions purchase was payable
for syndicate expenses under clause two of the subscription
agreements.

Threatened by these opposing demands and unable to
decide between them, the Trust Company filed a bill of in-
terpleader against the appellants and other members of the
syndicate, including Lancaster, and against Rhind, praying
that they be summoned into the Circuit Court of Baltimore
City and be there required to interplead and adjust their
conflicting claims and demands upon this fund amongst
themselves.   Most of the defendants filed answers.   Lan-
caster disclaimed any interest in the controversy, having

been paid by Rhind all he claimed to be entitled to. Subsequently a cross-bill was filed which was later on dismissed by a decree of June the thirteenth, 1894. By, this decree the original bill of interpleader was dismissed as to Lancaster and several other defendants, who disclaimed any interest in the fund ; and it was adjudged as to certain others of the defendants who had failed to answer, that they were not entitled to any part of the money in controversy. It was further provided that the remaining defendants should interplead, and for that purpose all except Rhind were made plaintiffs, and Rhind was made defendant. An agreement was then signed to the effect that Rhind would not, in the subsequent proceedings, make claim or contention that Lancaster was a necessary party to the suit. Quite a mass of evidence was taken, and after a hearing the Court below, on May the fifth, eighteen hundred and ninety-six, adjudged and decreed that the funds in Court belonged to Colden Rhind, free from any claims or interest of the other parties in the cause. From that decree these ten appeals have been taken.

There are two questions involved. First. It is insisted that the one and a-half per cent. for syndicate expenses out of the two and one-quarter per cent. interest does not extend to and include one and a-half per cent. on the three millions two hundred and fifty thousand dollars of bonds taken by what has been called the second syndicate. And, secondly, if the one and a-half per cent. does extend to the second purchase, then it is maintained that Rhind ought to be required to account for and pay to the appellants out of the funds in Court and which are claimed by him, the amount that he stipulated to pay Lancaster under the secret agreement between them, in prejudice of the rights of the other members of the syndicate.

With regard to the first question but little need be said. Whilst there is some conflict of opinion amongst the witnesses who, being members of the syndicate, have testified as to what their understanding of the matter was, we lay

that out of view altogether and look alone to the face of the written instruments themselves; and from their tenor and terms, construed in the light of the surrounding circumstances, this first contention must be judged.    Now, what the syndicate agreed to purchase from the Governor and Treasurer of South Carolina was, first, a block of two millions of certain bonds with attached coupons; and secondly, if the syndicate availed of an option given to it, another block of three millions two hundred and fifty thousand of the same series of bonds with attached coupons.    The separate obligation of each member of the syndicate bound the individual signing it to pay, first, for such portion of the two millions as he had agreed to take, and, secondly, should the option be availed of, then to pay such proportion of the residue as his original subscription would entitle him to in the larger amount.    Each subscriber further stipulated that out of the interest which would accrue July the first on the bonds subscribed for, the Trust Company should pay to R. A. Lancaster and Company for syndicate expenses two-thirds, or in other words "a commission of one and one-half per cent. out of the interest or profit received on said bonds." So that the rights of the members as to the profits of the venture were restricted to the excess for which the bonds might sell over and above the cost at which they were purchased, plus a share in three-fourths of one per cent. of the July interest—this three-fourths of one per cent. being the amount of the July interest remaining after the commission of one and one-half per cent. was paid by the Trust Company. Therefore, though the *title* to the proceeds of the July coupon vested in the Trust Company under the agreement with the State of South Carolina, it vested in trust for specified purposes.    When the option to take the remaining three millions two hundred and fifty thousand dollars of bonds was exercised, the syndicate was to "have the same rights and privileges in" them "as hereinbefore provided with reference to said two millions of said bonds."    That is to say, with respect to the three millions two hundred and fifty

thousand, the title to the proceeds of the coupons should vest in the Trust Company subject to the same trusts declared with respect to the proceeds of the July interest on the two million block, viz., for the payment of two-thirds to R. A. Lancaster & Company for syndicate expenses, and for the payment of the other one-third, or the three-fourths of one per cent., less other syndicate expenses, to the subscribers as part of their profits.    As the rights and privileges which the members of the syndicate were to have under the two millions purchase depended in part on what disposition was provided to be made of the proceeds of the coupon on that block of bonds ; and as they were to have precisely the same rights and privileges and none other with respect to the second purchase that they had in regard to the first, it follows that the right to share in the proceeds of the July coupon on the three millions two hundred and fifty thousand block could not be larger or more extensive than the right to share in the proceeds of the coupon on the two million block ; and that consequently the option subscription was also subject to the provision that two-thirds of the proceeds of the July interest was to be deducted for syndicate expenses or commissions.

This brings us to the other question respecting the claim of the appellants to a portion of the funds now in Court.

It has been stated in a preceding part of this opinion that the syndicate acquired title to the proceeds of the July interest, through the Trust Company, on the whole issue of five millions two hundred and fifty thousand dollars of bonds ; but the reasons for that conclusion have not yet been set forth.    The correctness of this position is of vital consequence in the discussion still to follow ; and it is therefore appropriate that it should now be clearly established.    What was it that the syndicate agreed to purchase ? Was it the bonds less the coupons, or the bonds plus the coupons ?    This inquiry is answered by the written contract between the syndicate on the one side through its agent the Trust Company, and the State of South Carolina by her

Governor and Treasurer on the other. Under that con-
tract, dated as already stated on January the nineteenth,
1893, the parties of the first part, that is, the Governor and
Treasurer, agreed to sell and deliver to the party of the sec-
ond part, that is, the Trust Company for the syndicate, and
the party of the second part on behalf of itself and as
agent for the others whose subscriptions were appended,
agreed to purchase from the parties of the first part two
millions of bonds and stock of the State ; and it was stipu-
lated that "the bonds and stock so purchased shall bear
date January the first, 1893, and shall *carry interest* from
January the first, 1893, payable semi-annually ; they shall
be sold by the parties of the first part and purchased by
the party of the second part at *par flat;* that is to say,
nothing additional shall be paid for any interest which may
have accrued at the time of delivery." The same terms
were prescribed with reference to the remaining bonds over
and above the first two million. It seems too clear for
controversy that under this contract the bonds and their
accrued interest up to the time of delivery were sold by the
State and bought by the syndicate. No other meaning can
be ascribed to the written contract ; and if this be so then,
as a matter of course, each and every one of the coupons
was included in the sale to the syndicate, and of necessity,
therefore, the coupon to mature on the first of July,
1893. There being no reservation of this July coupon,
and no exception of it from the sale, but on the contrary,
the clearest manifestation of an intention that it should ac-
company and go with the bonds to which it was attached ;
when the bonds were sold to the syndicate the July coupon
or interest was also sold, and the syndicate—the pur-
chaser—through the Trust Company, acquired title to that
July interest. Under the individual subscriptions antece-
dently made, the proceeds of the July coupon thus acquired
by the syndicate were impressed with a trust, and the Trust
and Guarantee Company was authorized to disburse the
fund for account of syndicate expenses and in a particularly

designated way.  Whatever the antecedent arrangements between Colden Rhind and the authorities of South Carolina may have been they were obviously superseded by the contracts of January the nineteenth and March the seventh, and no *title* to this interest passed to Rhind.  Whatever claim he has, or can assert, to any part of this interest, whether the claim be preferred as commissions or as syndicate expenses, must now be made through the syndicate, and must be derived from and founded on the second clause of the individual subscription contracts which were the basis of the final transaction and of the actual purchases of January the nineteenth and March the seventh, 1893.  As the claim made by Rhind must, to have any standing at all, come through the syndicate, it is necessary to describe his relations with and attitude towards that syndicate and to define the legal consequences flowing from that relation and attitude, as bearing upon his asserted right to the fund in controversy.

Now, a syndicate, according to the undisputed evidence, is an association of individuals, formed for the purpose of conducting and carrying out some particular business transaction, ordinarily of a financial character, in which the members are mutually interested.  It is as respects the persons composing it, a partnership, and in so far as these same persons are concerned the legal obligations assumed by them are, as between themselves, substantially the same as those which the law imposes on the members of an ordinary copartnership.  Scrupulous good faith is naturally, if not necessarily, implied from the very nature and character of the relation of partnership; and consequently, intrigues by one member for a private benefit to himself are clearly offences against the partnership at large, and as such are relievable in a Court of Equity.  For, as observed by LORD ELDON in *Crawshay* v. *Collins,* 15 Ves. 227, there is an implied obligation among partners to use the property for the benefit of those whose property it is.  A secret agreement, therefore, that one of the partners shall reap an

advantage out of the partnership property to the prejudice and injury of his associates, and of which they are kept in ignorance by his fraud and deception, is essentially at war with the good faith upon which the relation is founded. The evidence in this record illustrates the truth of this proposition, as the appellants, without exception, all testify that had they been informed that Lancaster was to receive any share of the sum set apart for "syndicate purposes" they would never have entered the syndicate, for the obvious reason that to the extent that Lancaster received a part of this sum he paid less for his bonds and could, therefore, sell them at a price below that which the other members were required to pay; whereby he secured an advantage over them wholly at variance with any notion of equality. It was the duty of Lancaster, acting for himself and as the agent of Rhind, to be perfectly candid and frank in his dealings with his associates; but he was not, and both he and his principal are answerable for his deception.

Again: Both Rhind and Lancaster were promoters of the syndicate, and it was their plain and imperative duty towards the persons who were invited to co-operate in the enterprise, not only to abstain from stating as a fact that which was not a fact, but not to have omitted to state any circumstance within their knowledge, the existence of which might in any way affect the extent or the quality of the advantages held out as inducements to the others. *Cortes Co.* v. *Thannhauser*, 45 Fed. Rep. 730, and numerous cases collected in a very full note to *Yale Gas. Stove Co.* v. *Wilcox*, 25 L. R. A. 90. Or, as put by VICE-CHAN. BACON in *Bagnall* v. *Carlton*, L. R. 6 Ch. Div. 385, relying on *Imperial Mercantile Credit Asstn.* v. *Coleman*, L. R., 6 H. L. 189: "The law I take to be clear, that under such circumstances an agent, whatever may be the nature of his employment, or under whatever circumstances, is bound, if he has any interest in the matter, not only to declare that fact, but to specify the nature of his interest; and that all persons who act with him, and who share in that interest, are jointly and severally

bound to make good, when their interest is discovered, to the principals, the whole benefit which has been obtained without the sanction of the principals."

The application of these familiar principles to the facts in these cases inevitably leads to but one result. If we treat the syndicate as a partnership subject to the law incident to that relation, and the fund arising from the July, 1893, interest on the whole five millions two hundred and fifty thousand dollars of bonds, as a partnership fund belonging to the syndicate, then all third persons who dealt with that fund in an unwarrantable way knowing that it was a partnership fund devoted to a particular purpose, must take the consequences which the law affixes to unauthorized dispositions of trust or partnership property. Rhind knew of the existence of the syndicate. He had commissioned Lancaster to form it. He likewise knew that the money to which he lays claim was payable by the State of South Carolina to the Trust Company as the money of the syndicate; and he knew this because it was the legal result of the purchase of the bonds by the syndicate. He also knew that Lancaster was a member of the syndicate and he was chargeable with knowledge that Lancaster could not stipulate with him for a share of these very funds unless by the consent of the other members of the syndicate; and he was bound to know that the advantage derived by Lancaster under that secret arrangement was one which, under the law, would enure to the use and the benefit of the copartnership. The payment made by Rhind to Lancaster of twenty-five thousand two hundred and fifty dollars out of the syndicate funds and pursuant to the terms of the secret agreement, was, under the facts in evidence, a clearly illegal diversion of the partnership funds. As concisely stated by Col. Marshall in his brief: " That money was clothed with a trust— as it were—a partnership money dedicated by contract to the payment of syndicate expenses and while other persons might become entitled to it for lawful consideration, there was one person who could not become entitled to it without

the full knowledge and acquiescence of his associates, and that person was Lancaster." Rhind turned over part of this fund to his confederate and he used every device to keep the other members of the syndicate in profound ignorance of what he had done. He thus gave to a person who was not entitled to receive any part of the fund and who was bound in good faith not to receive it, nearly one-third of the sum set apart for expenses ; and having thus unlawfully dealt with the partnership property by giving it to a person who he knew was not entitled to receive it and to whom he knew he had no right to give it, he is as accountable for that misapplication as is his confederate who clandestinely received it. This was an offence by both Rhind and Lancaster against the partnership and as such is clearly cognizable in equity under the general principle upon which equity prevents the abuse of undue influence and of fiduciary relations. The arm of a Court of Equity is strong enough to strike down such transactions as this. That Court will not falter or hesitate before mere technical forms of procedure when gross injustice has been done ; and where a fund claimed by a wrong-doer is under its control it will devise a remedy to meet each new emergency and will enforce a restitution if the ends of justice require it. It is for such exigencies that a Court of Equity exists. If a decree can be made upon the record to meet the substantial justice of the case it will be passed. *Crain* v. *Barnes and Ferguson,* 1 Md. Ch. Dec. 155. As said by LORD JUSTICE JAMES in *Panama, &c., Co.* v. *India Rubber, &c., Co.,* L. R. 10 Ch. Ap. 526 : " According to my view of the law of this Court, I take it to be clear that any surreptitious dealing between one principal and the agent of the other principal is a fraud on such other principal, cognizable in this Court. That I take to be a clear proposition, and I take it, according to my view, to be equally clear that the defrauded principal, if he comes in time, is entitled at his option to have the contract rescinded, or, if he elects not to have it rescinded, to have such other adequate relief as the Court may think

right to give him.    It is said there is no authority and no dictum to that effect.    The clearer a thing is, the more difficult it is to find any express authority or any dictum exactly to the point."

But to deal with the transaction from another point of view: Lancaster was confessedly Rhind's agent to form the syndicate—he was entrusted with full authority to accomplish that end—and Rhind is obviously bound by and responsible for the representations and concealments made by Lancaster in the line and within the scope of his employment.    *Rawlings* v. *Wickham*, 3 De. G. & J. 304; *Andrews et al.* v. *Clark*, 72 Md. 396; *West. Md. R. R. Co.* v. *The Franklin Bk.*, 60 Md. 36.    Now, as we have said already, before the final formation of the syndicate and at least a week prior to the execution of the contract of January the nineteenth, with the State of South Carolina, consummating the purchase of two millions of the bonds, Lancaster falsely represented to the appellants that he had no interest different from theirs in the undertaking, though at that very time he had in his possession a secret written agreement signed by himself and Rhind, under which he was to receive one-third of the sum that might go to Rhind as commissions.    He deceived, misled and deliberately imposed upon the appellants and induced them to incur obligations to large amounts which they would never have entered into had he revealed the truth with respect to the advantage which this secret agreement gave him.    Rhind now comes forward and claims under drafts drawn by his agent Lancaster, the very funds which if demanded by the agent would be payable to the syndicate, and they would be payable to the syndicate upon the theory that the stipulation made by the promoter for his own gain enures to the concern which he organized.    The rule is well settled that if the principal sues upon a contract made with and in the name of his agent, the opposite party is entitled to be placed in the same position at the time of the disclosure of the principal, as if the agent had been the real contracting

party. *Balto. Coal, Tar and Manf. Co.* v. *Fletcher & Murdock*, 61 Md. 295. If Lancaster were seeking to recover the funds in Court for his own benefit and behoof after his explicit declarations that he was not to receive any portion of them beyond five hundred dollars, there can be no question that he would be denied relief, because as promoter and partner he would not be entitled to them; and as Rhind occupies no better position than his agent could have maintained, he will not be permitted to receive the same funds except those in excess of the amount he unlawfully agreed to pay to Lancaster. In other words, before he can be paid through Lancaster under the drafts he now holds, any part of the fund now in Court he must make restitution of the amount which he participated in the diversion of from the syndicate. There is nothing in the evidence to show that more than one or two of the appellants ever knew that Rhind claimed any of the commissions when the syndicate was organized; and his right to them depends, therefore, not upon any understanding with the appellants, but upon the drafts drawn by Lancaster in his favor and not yet paid. There is, however, a part of the fund payable to Rhind under assignments from members of the syndicate other than the appellants, but this is not in controversy.

It is clear that Rhind has no greater or better right to these funds under the drafts drawn by Lancaster than Lancaster had at the time the drafts were drawn, and it is not material, so far as the consideration of this proposition is concerned, whether Lancaster is still a party to the case or not. He could not transfer to Rhind under the circumstances stated, a right to or claim upon the funds which would be superior to that which he possessed himself; and consequently any equities which the members of the syndicate had against Lancaster or the fund, growing out of his dealing with them in respect to it as the agent of Rhind, still attach to the fund when claimed by Rhind under the drafts drawn by Lancaster, because Rhind simply stepped into Lancaster's shoes. If Lancaster could not recover the fund,

and we have said he could not under the circumstances stated, in what better position does Rhind, his associate and assignee stand? By his own acts he enabled Lancaster to take an unlawful advantage of Lancaster's fellow-partners, and the advantage thus taken and participated in by Rhind is the very occasion that gives the copartners a claim upon the residue of the fund. Rhind comes, therefore, to a Court of Equity and asks it to decree to him a fund which it would not have directed to be paid to the very person under whom Rhind claims.

But it is retorted that Rhind was at liberty to employ such agents as he thought fit to form the syndicate, and that he could agree for and pay them such commissions as he might be inclined to; and that this was a matter which concerned only him and his agent, and that, therefore, he is in no sense blamable for not disclosing the secret agreement in which no one but himself and Lancaster were interested. This contention may be briefly but satisfactorily answered in the following sentences from *Bagnall* v. *Carlton, supra:* " But although this may have a certain air of plausibility, and it might be true if the vendors and their agents were the only persons concerned in the transaction, it is wholly fallacious when applied to the facts of this case. It wholly omits the consideration that the employment of the agent was for the purpose of forming a company, and of inducing other persons to subscribe in reliance upon a representation which was untrue."

But it is insisted that the case of *Whaley Bridge Calico Printing Co.* v. *Green aud Smith*, L. R. 5, Q. B. Div. 109, establishes and applies a principle which sustains the decree appealed from. The learned Judge who decided these cases below relied exclusively upon the case just cited. We fail after a most patient study of that case to see that it conflicts with any conclusion we have reached. Indeed it is an authority directly in point to support a part of the appellant's contention as will appear in a moment.

The *Whaley Bridge Company's case* was this: One Robert

Ellis Green purchased certain calico printing works for the sum of fifteen thousand pounds. Green and John Smith associated themselves together as promoters of a company formed for the purchase of the works from Green, and for the purposes of the negotiations for such purchase, a contract, which the jury found to be a sham contract, was entered into between them for the pretended sale of the works by Green to Smith for twenty thousand pounds. The company was ultimately formed, its directors being nominees of Green and Smith, and the works were conveyed by Green and Smith to the company for twenty thousand pounds. It was agreed between Green and Smith that Green should pay the sum of three thousand pounds out of the twenty thousand pounds purchase money to Smith, but this agreement was not communicated to the directors of the company when the sale to the company was effected. It was held by Bowen, J., that Smith, as a promoter of the company was not entitled to secure any profit to himself out of the formation of the company without the knowledge of the directors, and that such being the case the company were entitled to treat the agreement made between Green and Smith for the payment of the three thousand pounds, as made by Smith on the company's behalf and to enforce it against Green, and that consequently the company could recover from Green so much of the three thousand pounds which he had agreed to pay Smith, as remained unpaid. The action was founded on the contract between Green and Smith, and the company sought to enforce that contract for the payment of the three thousand pounds as a contract made for the profit of the company and not for the profit of Smith. The sole defence was made by Green—Smith not appearing—and he claimed "that as Smith could not enforce against Green a contract based on an illegal consideration, so neither can the company." But this was brushed aside with the remark that " It does not lie in Green's mouth to say that his own bargain with Smith was a fraudulent one and therefore cannot be enforced ;" and it was decided that

it was enough for the company to show that the three thousand pounds was a profit coming to its agent, Smith, to entitle it to claim the same.   As eight hundred pounds of the three thousand had been paid by Green to Smith a judgment was entered against Green for twelve hundred pounds and the negotiation of one of the company's promissory notes held by Green for one thousand pounds and which had been given him in part payment of the purchase money, was restrained and an order was passed directing the note to be delivered up to be cancelled.   Apparently no claim was made against Green for the eight hundred pounds actually paid by him to Smith.   If such a claim had been preferred it is not easy to see how logically there could have been any escape from allowing it.   If it was rightly decided that the undisclosed contract between Green and Smith for the payment to the latter of the three thousand pounds out of the purchase money, was a contract for the benefit of the company and not of Smith, then the money was payable by Green to the company and to no one else ; and if payable only to the company, obviously a payment by him to Smith was no payment to the company and was no discharge of Green's obligation ; and consequently such a payment would have been no defence to a demand by the company that the eight hundred pounds should be paid to it.   In a word, if the money was legally payable to the company, Green could not properly pay it to some one else ; but if he did pay it to some one else that fact did not relieve him of liability to the company.   This is inevitable, and to this conclusion the case relied on must logically lead.   But the case does *not* decide that the company could *not* recover from Green the eight hundred pounds which Green had paid to Smith—it merely decides that the company *could* recover the twenty-two hundred pounds remaining unpaid by Green to Smith ; whereas in the pending cases what is sought is not only a decree to compel Rhind to pay over to the syndicate what is still unpaid to Lancaster under the secret agreement, but to require him to make good the sum he actually *did pay*

to Lancaster thereunder—this latter exaction being precisely the very thing *not* discussed and *not decided* one way or the other in the *Whaley Bridge case.*

The appellants each claim, in the first syndicate, an amount that will bear the same proportion to the one and a-half per cent. on two millions of bonds, that the amount of subscription of each bears to the entire two millions ; and in the second syndicate, an amount which will bear the same proportion to the one and a-half per cent. on $3,250,000 of bonds that the amount of the subscription of each bears to the whole $3,250,000.

We hold then, for the reasons we have given, that Colden Rhind is accountable for the $25,250 actually paid over by him to Lancaster; and on the authority of the *Whaley Bridge case* we further hold that he is accountable for the one thousand dollars not paid over—it being part of the $26,250 agreed to be paid by Rhind to Lancaster as the latter's one-third of the one and one-half per cent. commission under the secret agreement of January the second, 1893 ; and that this sum of $26,250, with interest from July the first, 1893, and the costs of these cases above and below must be deducted from the funds in Court and paid to the appellants, the residue being payable to Rhind.   It follows, therefore, that the decree appealed from must be reversed and the cause must be remanded for a new decree.

> *Decree reversed and cause remanded*
> *that a new decree may be passed*
> *comformably to this opinion, the*
> *costs in this Court and in the*
> *Court below to be paid by Rhind*
> *out of the funds in Court.*

(Decided January 5th, 1897).