# T. EDWARD HAMBLETON ET AL. *vs.* COLDEN RHIND.

*Syndicate—Promoters—Quasi-Partnership—Distribution of a Fund Belonging to an Association When Some of the Members Renounce their Shares.*

A Trust Company was the agent of a syndicate which purchased a large issue of State bonds. The promoter of the syndicate was L. who was employed by R. to form the same. It was agreed 'among the members of the syndicate that a certain sum should be paid by the Trust Co. to L. for syndicate expenses. L. stated to the other members that he would not be personally entitled to this fund, but that the same belonged to R. who had negotiated the issue of the bonds with the State officers. In fact, however, there was a secret agreement between R. and L. by which L. was entitled to one-third of the amount so set apart for syndicate expenses, and this sum was paid to him with the assistance of R., his principal. The remainder of the fund was brought into Court under a bill of interpleader filed by the Trust Co. It was held on a former appeal that the secret agreement between L. and R. was a fraud on the other members of the syndicate; that they were entitled to their proportions of the sum so obtained by L., the same being a profit belonging to all the members in common, and that the remainder of the fund, which was payable to R., was liable to make good to the other members of the syndicate their shares of the amount so obtained by L. Some of the members of the syndicate had assigned their interests in the fund to R., and it was also held on the former appeal that he was entitled to these shares. The cause being remanded to the lower Court, it was claimed by R. that he was also entitled to the shares of certain members of the syndicate who had failed to answer the bill of interpleader or had disclaimed any interest in the amount paid to L. *Held,* that these abandoned shares were not separate funds belonging distributively to the particular members of the syndicate who had not answered the bill, but were parts of a common fund, the whole of which was the property of the syndicate, and upon the failure of some of the members to claim their shares, these belonged to the other members, and that R. was not entitled to any part thereof, except as assignee of some of the parties.

Appeals from the Circuit Court of Baltimore City (DENNIS, J.)

The cause was argued before McSHERRY, C. J., BRYAN, FOWLER, BRISCOE, PAGE and BOYD, JJ.

The Court declined to hear *D. K. Este Fisher* (with whom were *Charles Marshall, Wm. A. Fisher, Archibald H. Taylor* and *W. Cabell Bruce* on the briefs ), for the appellant.

*Edwin J. Bœtjer* (with whom was *Richard M. Venable* on the brief ), for the appellee.

The commission of one and one-half per cent. having been made payable to Lancaster, he drew on the Trust Company two sets of drafts payable to Colden Rhind, to whom it was really payable, for $73,150, $5,000 having been advanced to Rhind. 1st. One set of drafts for $26,250, one-third of the whole. 2d. One set for $48,500. The first set, for $26,250, were by Rhind endorsed back to Lancaster and paid by the company. The second set, for $48,500, were accepted by the company " when in funds."

After Lancaster's drafts had been paid, and while the Trust Company still held the $48,500 belonging to Rhind, some of the subscribers discovered the payment to Lancaster and they at once protested against any further payment of commissions. Lancaster had been a subscriber to the bonds ; he had largely organized the enterprise and claimed to have no advantage over the other members.

It was contended : 1st. That the secret profit paid to Lancaster, one of the associates, really belonged to all of the subscribers. 2d. That Rhind was Lancaster's principal and should make good out of the $48,500 belonging to him and still in the possession of the Baltimore Trust and Guarantee Company, the $26,250 for which Lancaster was liable, and that this should be treated as profit of the syndicate. All the subscribers were notified of these facts. Rhind claimed the whole $48,500. The subscribers divided into two classes. One class, comprising more than one-half in interest of the subscribers, conceded Rhind's rights and declined to contest his right to the fund. The other class insisted on the claims above set forth. This other class consisted of the appellants in the former appeal and the appellants in the present appeal, exclusive of Heald & Company.

The bill of interpleader was then filed by the Trust Company, reciting the claims of Rhind on the one hand and those of the subscribers on the other. The decree of interpleader was subsequently passed and the subscribers no contesting Rhind's rights, having defaulted, it was adjudged that they had no interest in the fund.

By the decree passed in accordance with this Court's opinion, the appellants were each allowed their share of the secret profit wrongfully paid to Lancaster of $26,250, *i. e.*, each was allowed, in accordance with clauses 1, 2 and 3 of the syndicate agreement, that part of the $26,520 which bore the same proportion to the whole that the subscription of each bore to the total subscription. These amounts are. set forth in paragraph 1st of the decree. They, however, were not satisfied with this, but claimed that they were entitled for their own benefit to the shares of the other who had disclaimed and declined to oppose or contest Mr. Rhind's rights.

The appellants (other than Heald & Company) have all been awarded their own shares of the $26,250, and the single question now to be decided is " can the appellants compel Mr. Rhind to pay to them for their own benefit the shares of the four subscribers who have declined to assert any claim against Mr. Rhind, and disclaimed any claim against him ?" The opinion of the Court on the former appeal does not specifically decide the former question ; so far as the views of the Court as to this question are disclosed they are adverse to the appellant's contentions.

I. The fund in Court representing the share of the four non-claiming subscribers to the loan was the separate and absolute property of these subscribers ; and the appellants did not originally have and have never acquired any interest in these shares, and are, therefore, parties without interest and their appeals should be dismissed.

When Lancaster unlawfully took $26,250, he became liable to each subscriber for such subscriber's share in the $26,250. The liability was separate to each subscriber ; it

was distinctly a separate claim. If Mr. Lancaster had then paid any one of the subscribers, such as Messrs. Hambleton & Co., their share of the amount thus taken by him, certainly he would have been discharged from all further liability to them. Now Rhind's liability is the same as Mr. Lancaster's—certainly no greater—and the funds in Court are answerable for Mr. Rhind's liability only, and what would discharge Messrs. Hambleton & Co's. claim against Mr. Lancaster, if Hambleton & Co. had sued Lancaster, will discharge his claim against the fund in Court.

The separate share of each and of these four subscribers is not a sum of money in Court belonging to them. The fund in Court is part of $48,500 representing Rhind's own two-thirds of the commission, and which he acquired by virtue of the original agreement and Lancaster's drafts. The $26,250, which really belonged to the subscribers, was withdrawn and paid to Lancaster. Under the decision of the Court: 1st. Rhind was liable as Lancaster's principal for the share of each in this $26,250. 2d. Rhind's $48,500 was equitably charged to satisfy these liabilities. The subscribers each had the right to sue Rhind or Lancaster, or both, and, if no fund had remained in Court, these are the rights they would have exercised. Now they had the right to satisfy their claims out of the funds in Court, but certainly they were not obliged to seek satisfaction from this fund belonging to Rhind and release Lancaster altogether. They certainly had the right to elect what course they would pursue. Now certainly the payment of the non-claiming members' shares to the appellants is not a satisfaction of their claims against Rhind and Lancaster, and a bar to a suit for account of money had and received; the appellants cannot elect for the non-claimants which of the courses they will pursue or force them thus to abandon the personal claim. If the payment to the appellants is not a satisfaction, then, although these non-claiming members may have no rights against the fund, their claim against Rhind and Lancaster remains unaffected, and they will be

obliged to pay these shares twice. These appellants, we respectfully submit, can not elect for the non-claiming members and pursue the fund belonging to Rhind and fasten on it an equitable claim.

The appellants, however, claim that they have a right to these unclaimed shares, because they are profits of the partnership in which they are, therefore, jointly interested and entitled to collect. It is not true that the subscribers were strictly partners; but whether they were or not, we apprehend is immaterial. The rights of the subscribers, whether partners or not, are governed by the agreement. There is no question of estoppel or holding out, and the rights of the partners are to be determined just as if the controversy were *inter se;* and in such controversies the rights are fixed by the agreement. This agreement gives to the partners separate rights; not a joint right to the whole but a separate right to each to a part; if their rights were at any time joint during the early stages of the negotiations, and these proceeds joint property, they converted them into separate property by the agreement; they withdrew these proceeds from the joint fund; they could not be used without the consent of each subscriber to carry out any incomplete joint work; they converted these proceeds, if they ever were joint estate, into the separate estate of each. Or, if we treat the whole $26,250 as profit and joint property, the result is the same. In this event, each partner or co-owner would have had an interest therein. But, when they undertook to divide this joint fund, and each of the appellants took his own separate share, the shares of the others did not remain the joint property of these others and the appellants, but the share of each of the others was no longer profit belonging jointly to all but his own separate property. Under no circumstances, however, can the appellants, by virtue of any claim of partnership, sustain their contention. One partner may, in conjunction with all others, assert a joint claim to partnership property on behalf of the partnership. His separate claim, or claim to

a separate share, is to his own share alone, and his claim to a part of the assets for his exclusive benefit apart from his associates is to his own share only. So that, even if we treat the shares of the non-claiming members as so much money in Court belonging to them, the appellants' claims thereto are unfounded. If our contentions thus far are correct, and the appellants had no interest in the shares of these other four subscribers by virtue of the original agreement, then unless they acquired an interest by the disclaimer or other proceedings they have no interest, and the appeals must be dismissed, no matter what Mr. Rhind's own rights may be ; if they are not interested in the fund, no error in its disposition can prejudice them. We contend, however, that the situation of the parties was such that the effect of the subsequent proceedings was to make his right absolute.

II. The effect of the disclaimer was not to transfer any interest to the appellants, but to release Rhind and the fund in Court belonging to him from the claims of those disclaiming.

The situation of the parties is, in considering the matter, most important. The fund in Court, *i. e.*, $48,500, was Rhind's own two-thirds of the commission, which he acquired by virtue of the drafts of R. A. Lancaster ; the $26,250 to which the subscribers were entitled had been paid to Mr. Lancaster. Under the decision of this Court the subscribers then had the following rights : 1. To hold Rhind liable personally for their shares of the money wrongfully paid to and abstracted by Lancaster. 2d. To fasten their claim against Rhind on his money in Court and to make this fund answerable for it.

Rhind therefore took the $48,500 subject to the equities of each subscriber to have Rhind's liability to him paid out of this fund. When they renounced, therefore, they did not renounce a claim to a sum of money in Court belonging to them absolutely, but they disclaimed and declined to prosecute their claim to have Rhind's money held equitably charged with the debt due by him.

III. The effect of the decree of interpleader adjudging that

the non-claiming subscribers have no interest in the fund, frees and discharges the funds in Court from their claims, and leaves Rhind's title thereto absolute.

And here again the situation of the parties is important. Rhind on the one hand had title to $48,500; each of the subscribers on the other, claimed that this fund was subject to an equitable lien belonging to each for the separate debts due each by Rhind. It was a case of *Each one of the Subscribers* v. *Colden Rhind.* The controversy was necessarily a separate one for each, any subscriber to whom the profit had been disclosed, such as J. S. Williams & Son, would have no rights; anyone from whom it was concealed would. The subscribers, therefore, who were plaintiffs, each claimed a separate right or incumbrance on Rhind's money. When the decree determined that these four subscribers had no claim on the fund, it was a decree for the defendant, Rhind, against the four subscribers, and determined that their claim to a lien on Rhind's money in Court was unfounded and left the fund, Rhind's, free from any lien for Rhind's indebtedness to them.

IV. That the final decree is final and conclusive as to the shares of all persons save those who appealed.

The effect of this final decree is material only in case the Court should find that the interpleader decree was not final. We have already shown that the controversy between Mr. Rhind and the subscribers was between him and each of the subscribers; that it was a separate controversy between him and each subscriber; that their rights were distinct and that one subscriber to whom the profit was disclosed, like J. S. Williams & Son, would have no right to recover, and another to whom it was not disclosed, would be entitled; that the subscribers severed their claims and rights, and took separate appeals. Under these circumstances, the four subscribers above-mentioned, not having appealed from the final decree, it is as to them conclusive; and Rhind is entitled to their shares free from all claims; a reversal on an appeal by others does not affect the decree as to them.

*Enos* v. *Copps*, 12 Ills. 256; *Lanahan* v. *Latrobe*, 7 Md. 268.

McSherry, C. J., delivered the opinion of the Court.

There are four appeals in this record, and these cases with six others that await the determination of those now pending were in this Court on a former appeal; the decision being reported in 84 Md. 456. One of the questions involved is common to the ten cases—these four and the six still remaining in the Court below—but the other question is confined to three of the appeals now before us. We will first dispose of the question arising in all the cases and in another opinion we will deal with the remaining subject of controversy. On the former appeals the precise point at issue was the ownership of a fund in Court. The fund had been brought into Court under a bill of interpleader. On the one hand the fund was claimed by the appellee Colden Rhind, and on the other by the appellants who, with others, were members of a syndicate which had been formed to purchase and float a large block of the four and a-half per cent. State bonds of South Carolina. The fund litigated over arose in this way: The syndicate selected the Baltimore Trust and Guarantee Company to be its agent in negotiating with the officials of South Carolina respecting the purchase of the bonds. By one of the provisions contained in each of the several subscription agreements signed by every member of the syndicate it was stipulated that two-thirds of the two and one quarter per cent. interest to mature on said bonds between January the first, and July the first, eighteen hundred and ninety-three, should be paid by the Trust Company to R. A. Lancaster and Company "*for syndicate expenses.*" Lancaster, himself a member of the syndicate and also the agent of Rhind in promoting the undertaking, represented to the other members of the syndicate that he would be entitled to only about five hundred dollars of this sum so set apart for "*syndicate expenses,*" and he intimated if he did not assert that the rest of the money

was payable to parties in South Carolina; though he solemnly and repeatedly declared that he did not know and did not wish to know who would receive it.   At the time he made these statements he was fully aware of their utter falsity, for he then had in his possession a secret written agreement, signed by Rhind and himself, in which they stipulated to divide the sum so appropriated to syndicate expenses, between themselves in the proportion of two-thirds to Rhind and one-third to Lancaster.   When the fund out of which the syndicate expenses were payable was received by the Trust Company, Lancaster drew his drafts thereon to the amount of twenty-five thousand two hundred and fifty dollars in favor of Colden Rhind, and the latter, in performance of the secret agreement just alluded to at once indorsed them in blank without recourse and delivered them back to Lancaster, who procured the money thereon for his own use.   When this fraudulent conduct was discovered many of the members of the syndicate insisted that the Trust Company should pay no more of the fund upon Lancaster's drafts until the amount thus surreptitiously secured by Lancaster should be made up to the syndicate out of the residue of the fund devoted to syndicate expenses, so as to place these members of the syndicate more nearly upon an equality with their copartner Lancaster. Lancaster, however, drew three more drafts aggregating forty-eight thousand five hundred dollars, on the same fund in favor of Rhind.   In this state of the conflicting claims to the fund the bill of interpleader was filed by the Trust Company.   The Trust Company, though a member of the syndicate, disclaimed in its bill of complaint any interest in the fund of forty-eight thousand five hundred dollars still remaining in its hands as the residue of the amount specifically appropriated to syndicate expenses, and by the interpleader decree the members of the syndicate who claimed the fund were made plaintiffs and Rhind was made defendant.   By the same decree the bill was dismissed as to Lancaster because he disavowed any title to the fund, having been pre-

viously paid by the proceeds of the drafts for twenty-five thousand two hundred and fifty dollars ; and it was adjudged as to some other of the defendants, who had failed to answer the bill, that they were not entitled to any part of the fund. The contest then proceeded between the remaining members of the syndicate and Rhind, and ultimately resulted in a decree which awarded the whole fund to the latter. An appeal was then taken to this Court and on January the fifth, 1897, the decree appealed from was wholly reversed. In that controversy Rhind based his claim to the fund on two grounds. *First*, that he was entitled to the entire forty-eight thousand five hundred dollars under the three drafts drawn by Lancaster on the Trust Company in his, Rhind's favor ; and *secondly*, because though under the syndicate subscriptions signed by the various members of the syndicate, the fund was made payable to Lancaster, it was well understood and known by the members of the syndicate that the money was really payable to Rhind under his original contracts with the Governor of South Carolina.

We decided when these questions were presented on the former appeals that, under the contracts entered into between the Trust Company acting as the agent of the syndicate, and the State authorities of South Carolina, " one of the things which the members of the syndicate contracted to get, and one of the things that was to be their *common property* * * * was this six months' interest. * * '' In other words, one of the things which was to be the common property of the syndicate was this very six months' interest out of which the syndicate expenses were specifically payable. " The Trust Company," we went on to say, " was authorized to disburse in discharge of syndicate expenses *from this common or partnership fund* for the benefit of the whole syndicate, two-thirds." * * In giving our reasons for the conclusion that the fund out of which the syndicate expenses were to be paid belonged to and was the property of the syndicate and not of Rhind, we proceeded

to state that: " There being no reservation of this July coupon and no exception of it from the sale, but, on the contrary, the clearest manifestation of an intention that it should accompany and go with the bonds to which it was attached; when the bonds were sold to the syndicate the July coupon or interest was also sold, and *the syndicate* (the purchaser) through the Trust Company acquired title to the July interest. Under the individual subscriptions antecedently made, the proceeds of the July coupon thus acquired by the syndicate were impressed with a trust, and the Trust and Guarantee Company was authorized to disburse the fund for account of syndicate expenses and in a particularly designated way. Whatever the antecedent arrangements between Colden Rhind and the authorities of South Carolina may have been, they were obviously superseded by the contracts of January the nineteenth, and March the seventh, *and no title to this interest passed to Rhind.* Whatever claim he has or can assert to any part of this interest, whether the claim be preferred as commissions or as syndicate expenses, must now be made through the syndicate, and must be derived from and founded on the second clause of the individual subscription contracts which were the basis of the final transaction and of the actual purchases of January the nineteenth and March the seventh, 1893." It is perfectly obvious, therefore, that one of the propositions distinctly and flatly determined in the former appeals was, that the whole fund *then* in controversy—and the whole fund *then* in controversy included the identical *part* now in dispute—was a common or partnership fund and was the property of the syndicate and not the property of Rhind. We further held that as Rhind and Lancaster had entered into a fraudulent scheme to secure to Lancaster, one of the members of the syndicate, an advantage over the other members, he, Rhind, was answerable for the fraud and misrepresentations of his agent as well as for the fraud and want of frank dealing of which he and Lancaster, as promoters of the syndicate had been guilty; and that the fund

payable to Rhind under the drafts and amounting to forty-eight thousand five hundred dollars, was liable to make good the injury done to the other members, to the extent of the secret and fraudulent profit secured to Lancaster. As the secret and fraudulent profit which Rhind had agreed to pay Lancaster was twenty-six thousand two hundred and fifty dollars or one-third of the whole seventy-eight thousand seven hundred and fifty dollars which constituted two-thirds of the July coupon on the total amount of bonds purchased, we further held that Rhind must pay to the syndicate out of whatever interest he had in the fund in Court the sum he participated in turning over, as an unlawful profit, to his confederate Lancaster under the pretext of applying it to syndicate expenses. But as Rhind held by assignments from some members of the syndicate transfers of their undivided interests in this reclaimed fund, it was stated in the opinion that he would be entitled to those assigned interests. As between Rhind and the syndicate, Rhind was entitled to no part of the twenty-six thousand two hundred and fifty dollars wrested from him ; but Rhind, as assignee of some members of the syndicate, became the owner of the proportions which the assigning members would have taken upon a distribution of the fund, but for those assignments. These conclusions, reached after full arguments and upon mature reflection, irresistibly led to an entire and total reversal of the decree appealed from, and the causes were remanded to the lower Court for the passage of a new decree conforming to the opinion of this Court. When the record reached the Circuit Court of Baltimore City it was contended by Rhind that the shares of those members of the syndicate who had failed to answer the bill of interpleader, and who the decree of the lower Court had, in consequenee, adjudged to have no interest in the fund, belonged to him ; whilst the members of the syndicate who had made the contests and secured a reversal of the final decree, insisted that these lapsed or abandoned shares, as they are called, belonged to the syndicate and were divisible between themselves and

Rhind upon the basis upon which the twenty-six thousand two hundred and fifty dollar fund was divisible—Rhind being entitled only in virtue of the assignments heretofore alluded to. In one view of the case there are five of these lapsed or abandoned shares aggregating six thousand eight hundred and thirty-eight dollars and thirty-six cents; in another view there are but four such shares, amounting to six thousand three hundred and forty-one dollars and seventy-two cents. Whether there are four or five lapsed or abandoned shares is the question we shall deal with in the next case. To whom do the funds representing the lapsed or abandoned shares actually belong—whatever their number may be, is the inquiry now involved. The Court below signed a decree on April the third, wherein by sec. 4 of paragraph V, it awarded the whole of the lapsed or abandoned shares to Rhind, and wherein by sec. 3 of paragraph V it rejected the claim of Heald & Company to participate in said fund wrested from Rhind by the former decree of this Court passed January the fifth, 1897. From the decree of April the third the pending appeals were taken.

The lapsed or abandoned shares, that is, the shares which would have belonged to the Trust Company and certain members who failed to answer the bill of interpleader, were not separate and distinct funds belonging distributively to these particular members of the syndicate; but they were parts of a common fund, the whole of which was the property of the syndicate, held for ultimate distribution amongst such of the members as should in due season make claim thereto. These so-called lapsed shares did not belong to Rhind, nor were they owned by Lancaster. They, together with the other shares, made up a common or partnership fund which was divisible into as many properly apportioned parts as there might be rightful claimants. If the lapsed shares were fractions of an entire fund, the whole of which, undivided into parts belonged to the syndicate in common; then the failure of some of the members to claim the por-

tions that would have gone to them had they made claim
thereto, obviously did not divert those portions from or di-
vest them out of the syndicate and most certainly did not
transfer them to Rhind ; but left them just where this Court's
decree declared them to be—that is, in the syndicate. The
whole twenty-six thousand two hundred and fifty dollars
being by reason of the fraudulent conduct of Lancaster and
Rhind, syndicate assets, and not the separate apportioned
assets of any particular member, and being in no sense the
property of Rhind except in so far as he became the assignee
of some of the members, Rhind could not possibly acquire
a title to them by the mere failure of some of the members
to demand what would have been theirs had they season-
ably claimed it. The controversy when it originated did
not present the case of an interpleader between two parties
where the funds belong to one or the other of them, and
where one only asserts in the proceedings a claim and the
other forbears to do so, but permits a decree to go against
himself by default. The fallacy of the appellee's argument
consists in assuming that this is such a case. The contest
was between an individual and a *quasi* copartnerhip. The
individual was declared not to be entitled to the fund, but
the syndicate or copartnership was decreed to be the owner
thereof. The mere fact that some of the members of that
partnership did not claim any part of its assets did not dis-
entitle the partnership to the fund or deprive the other mem-
bers of the right to appropriate what would, upon a distri-
bution of the syndicate's assets, have gone to the defaulting
members had they demanded it. The failure of some mem-
bers of the syndicate to claim an interest in the fund did not
and manifestly could not deprive the syndicate of that fund
or of any part of that fund. The lapsed or abandoned
shares were no more segregated from the total fund than
were the shares of the contesting members. There had
been no apportionment when the bill of interpleader was
filed, nor did the decree finally passed on that bill make any

division.   The decree of this Court filed January fifth, 1897, did not divide the fund into shares, but declared the entire fund, that is, the twenty-six thousand two hundred and fifty dollars, to be the property of the syndicate ; and whilst the opinion stated that the members of the syndicate would be entitled to the fund in a named ratio, that rule of apportionment by no means excluded a participation by the contesting members in the lapsed or abandoned shares.   The prior contestation was over the whole fund—Rhind on the one hand claiming all of it, and the members of the syndicate claiming it, on the other hand, as the property of the syndicate ; and that issue was finally concluded by a decree which determined that Rhind owned none of the fund in virtue of either of the two grounds upon which he founded his title to the whole.   That same decree further conclusively settled the fact that the *syndicate* owned the entire twenty-six thousand two hundred and fifty dollars, though Rhind under certain assignments and, therefore, through the syndicate, was conceded a portion of it.   In a word, when reduced to its last analysis, the claim now made by Rhind is to *part* of a fund, the *whole* of which we heretofore decided belonged to some one else, and, therefore, that no part of it belonged to him in his own right.   The ground upon which he asserts title to the fraction that he now claims is the identical ground that he relied on to support his disallowed claim to the *whole* fund.   If that ground was untenable as to the *whole* fund it must be equally so as to every part of it.   We are unable to see how there can be any logical escape from the conclusion that Rhind is not entitled, in his own right, to a *part* of a fund, after we have deliberately determined that he had *no interest* whatever in the fund at all.   If the *whole* includes all its parts and the *whole* has been adjudged to belong to the *syndicate*, then there has been a flat decision that *Rhind* is not entitled to *any* of the fund except by virtue of the assignments he holds. This being so it follows, of course, that section 4 of para-

graph V of the decree appealed from is erroneous and must
be reversed.

> *So much of the decree as has been*
> *appealed from, to-wit, sec. 4 of*
> *paragraph V is reversed with costs*
> *above and below, and the cause is*
> *hereby remanded for a new decree*
> *in this particular, conforming to*
> *this opinion.*

(Decided June 23rd, 1897).