## WALRATH v. CUSHING ET AL.

[No. 204, September Term, 1958.]

---

*Decided April 16, 1959.*

The cause was argued before BRUNE, C. J., and HENDERSON, HAMMOND, PRESCOTT and HORNEY, JJ.

*John Grason Turnbull,* with whom was *John Warfield Armiger* on the brief, for appellant.

*W. Lee Harrison* and *Richard C. Murray,* for appellees.

HENDERSON, J., delivered the opinion of the Court.

Nelson E. Walrath and Harrison J. Chubb filed a bill for accounting and discovery against the appellees, relying upon a joint venture agreement executed August 15, 1955, and alleging, in effect, that Raymond Cushing had, by duplicity and deceit and in violation of the agreement, purchased a certain valuable cemetery property for his own account, and praying that the court impose a constructive trust and require an accounting. After answer and a full hearing on the merits, the Chancellor dismissed the bill. Walrath, but not Chubb, appeals here.

The case involves no major dispute as to the applicable legal principles. It is conceded that joint ventures owe each other the duty of loyalty and fair dealing. A leading case on the subject is *Meinhard v. Salmon,* 164 N. E. 545 (N. Y.). Cf. *Hambleton v. Rhind,* 84 Md. 456, 487, and *Nagel v. Todd,* 185 Md. 512. See also note 62 A. L. R. 13,

24. The case turns largely upon questions of fact. In 1955, Cushing was and had been for many years, the owner and operator of an active cemetery company, known as Belair Memorial Gardens, Inc. He was a man of considerable financial standing and substantial credit rating. He hired Chubb as a sales manager. Chubb introduced him to Walrath, with whom Chubb had previously been associated in Pennsylvania. Walrath convinced Cushing of the possibilities of large profits in the promotion of cemetery business, and particularly mentioned nearby Kenwood Memorial Park Cemetery, a long inactive cemetery in Baltimore County, for which Walrath had been dickering. Cushing was interested in seeing that this cemetery, at least, did not get into the hands of a competitor. He seems also to have been impressed with Walrath's claims of promotional abilities and connections. On August 15, 1955, Walrath, Chubb and Cushing signed an agreement of joint venture, "for the establishment, development and operation of cemeteries in Maryland," subject to restrictive provisions, "that none of the three parties may enter into any contract covering any phase of the cemetery business * * * (exempting Belair Memorial Gardens, Inc., * * *) without inviting the other parties on a share and share alike basis; and further, if any sum of money is involved each of the parties shall be given at least thirty (30) days to raise his equal share of the fund after written notice has been given," with a further proviso that no party should "sell, transfer or pledge his interest (exempting Belair Memorial Gardens, Inc.) in the joint venture or any part thereof without first having offered [it] to the other parties hereto at a price equal to any bona fide offer, and having given thirty (30) days notice in writing." It was further provided that the agreement should remain in force until terminated by written agreement of all the parties.

Pursuant to this agreement, contracts for the purchase of three different tracts were negotiated by Walrath. One proved abortive because of zoning restrictions. One for Evergreen Memorial Gardens was executed on September 21, 1955, and the other, for Kenwood, was executed on October 11, 1955. As found by the Chancellor, Cushing had believed

that Walrath was able to interest investors almost without limit. He became aware, however, that Walrath had no financial resources of his own, and was unable to produce investors. In connection with Evergreen, Cushing was compelled to put up $2,500 on that purchase, to lend his credit to obtain loans, to oust Walrath as manager of Evergreen, and eventually, on March 15, 1957, to buy him out, upon payment of some $18,000. We need not discuss these matters in detail.

As regards Kenwood, the contract recited an initial payment of $1,000, with an additional $9,000 to be paid within 30 days, and the balance of $190,000 within 90 days. The joint venturers were unable to raise the $9,000 payment within 30 days, but Cushing obtained an extension of 30 days by making another $1,000 payment, and two other extensions upon the payment of the same amount. On February 10, 1956, the sellers refused to grant any further extension, and declared that the $4,000 deposit would be forfeited. They told Cushing that they would have nothing further to do with Walrath or Chubb, but would consider entering into a new contract with Cushing personally. Cushing informed Walrath and Chubb that no further extension could be obtained.

A meeting of the joint venturers was held that same evening, or shortly thereafter. Cushing pointed out that they had failed to contribute at all to the project, and said he wished to terminate the agreement. Apparently, they raised no objections. Certainly they made no offer to contribute. By letters dated February 13, 1956, Cushing wrote each of the other parties that "in view of the fact that you have failed to comply with the terms of the contract dated October 11, 1955, for the purchase of Kenwood," he regarded the agreement as at an end. Chubb replied by letters dated March 1, 1956, likewise terminating the joint venture agreement. By letters dated April 16, 1956, Walrath did likewise. Meanwhile, it appears that on February 13, 1956, Cushing, through his corporation, Belair Memorial Gardens, had entered into a new contract to buy Kenwood at the same price, $200,000, although the contract specified a down payment of $5,000, balance to be paid within 33 days. While not entirely clear

on the record, it would appear that Cushing received credit for the $4,000 paid under the old contract at the settlement in November, 1956. Walrath contends that this was a breach of good faith, and that his agreement to terminate, as evidenced by his letters of April 16, was made without full disclosure of the situation by Cushing, and without knowledge on his part that Cushing had procured a new contract on his own account.

The Chancellor found otherwise, and the finding is supported by the evidence. The agreement of August 15, 1955, was a curious document, containing no specific terms in relation to any proposed joint venture, but simply personal and mutual, negative restrictive covenants, unlimited as to time or place. Cf. *Tawney v. Mutual System of Md.*, 186 Md. 508. For present purposes, we shall assume that it was binding and enforceable. In any event, the restriction upon contracting on one's own account was not absolute but conditioned upon prior invitation for the financial participation of the other parties. We think there was evidence of such invitation. The others had their opportunity to participate in the original contract, and neglected and failed to do so. We think Cushing was justified in terminating the agreement on that ground. See the cases collected in a note 11 A. L. R. 432. They also acquiesced in the abandonment of the joint venture agreement. Cf. *Bringgold v. Stucky*, 202 N. W. 739 (Minn.). It seems perfectly clear that neither Walrath nor Chubb was in a financial position to contribute any funds whatever to the purchase, either under the old or a new contract.

Moreover, the Chancellor found as a fact that Walrath knew that Cushing had obtained a new contract when he wrote his letters of April 16, 1956, if he did not know it before. Walrath admitted that about a week after February 10, 1956, he heard that Cushing was buying Kenwood on his own account, and complained about it. Cushing told him he was trying to interest another group to complete the purchase; Walrath testified, "he led me to believe it was incomplete." This was literally true. Cushing was only able to complete the settlement in November, 1956, by large payments on his

own account, by interesting other investors and personally guaranteeing their investments. Walrath's admission clearly implies knowledge on his part that Cushing had some commitment for Kenwood; the real doubt in Walrath's mind was whether Cushing could raise the funds to complete the transaction. After this conversation with Cushing, Walrath, accompanied by a Mr. Cody, visited the broker in whose hands Kenwood had been placed by the sellers, and made a tentative offer to buy Kenwood at an enhanced price. It seems that Cody had had a contract to purchase Kenwood early in 1955, but it had been forfeited because he was unable to raise the necessary funds. The broker told them a new contract had been signed, but refused to disclose the name of the purchaser. Walrath then offered to take an assignment of the new contract, but this was declined.

In the latter part of February, there was another meeting of the joint venturers, at the office of a lawyer who had previously represented them. There was a discussion of a settlement of the Evergreen matter. Walrath complained that he was being "forced out" of the joint venture agreement. The lawyer testified that he knew Cushing had a contract on Kenwood, and was "under the impression" that this was known by all the parties. The lawyer testified that he asked Cushing "if you get Kenwood, will you take Mr. Walrath into the venture * * * if he agrees to get together on the Evergreen deal?" Cushing replied "I will." Walrath said he would "think about it," but a few days later he called the lawyer and said "he wouldn't go along." Walrath admitted that Chubb told him "a couple of months" after the meeting on February 10, that the owners of Kenwood would not deal with the three venturers, but would sell to Cushing because of his greater financial standing. Presumably, this was before he wrote the letters of April 16.

At the trial, Walrath attempted to explain his letters of April 16, 1956, consenting to termination of the joint venture agreement, by testifying that "I just wanted to be free to do anything I wanted to do * * * because Kenwood was hopeless." There was evidence that he, and Mr. Cody, entered into protracted negotiations for another tract, after they had

been unable to obtain Kenwood on their own account. We think there was ample evidence to permit the finding that he was sufficiently apprised of the status of Kenwood when he agreed to the termination of the agreement of August 15, 1955. We also think that his inability or unwillingness to contribute to the project was sufficiently shown, to justify its termination by Cushing, with or without his consent.

*Decree affirmed, with costs.*